# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 16, 2010 Session

## IN RE KEISHEAL N.E. ET AL.[1]

**Appeal from the Juvenile Court for Coffee County**
**No. 935-05J      Timothy R. Brock, Judge**

---

**No. M2009-02527-COA-R3-PT - Filed May 28, 2010**

---

Father appeals the termination of his parental rights to his children. The trial court found three grounds upon which Father's parental rights could be terminated: lack of mental capacity to care for the children, abandonment by failure to visit, and substantial noncompliance with the permanency plan. The psychologist who testified at trial stated that Father was presently unable to properly care for his children due to the diagnosis of schizoaffective disorder. The psychologist also testified that it was possible Father could become a competent parent with the proper medication and treatment. The Department, however, provided no mental health services to assist Father. The statutory ground of mental incompetency as a basis for the termination of a parent's rights requires clear and convincing proof that the parent's mental condition is presently so impaired and is so likely to remain so that it is unlikely the parent will be able to care for the children in the near future. The Department proved that Father's mental condition was such that he could not presently care for the children; however, the Department failed to prove that Father's mental condition is likely to remain impaired to the degree that it is unlikely Father will be able to care for the children in the near future. We have also determined the Department was not excused from exerting reasonable efforts and yet it failed to establish that it exerted reasonable efforts to assist Father to accomplish the goal of reunification because it provided no services that dealt with the root of Father's problems, his mental illness. For the above reasons, we find the Department failed to prove any ground upon which Father's parental rights could be terminated. Accordingly, we reverse the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

---

[1]This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Jeffrey C. Gruber, Murfreesboro, Tennessee, for the appellant, Keith E.

Robert E. Cooper, Jr., Attorney General and Reporter, and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

The Department of Children's Services filed a petition to declare the three children at issue dependent and neglected on December 21, 2005, after learning their mother, Rachel E. (Mother), had admitted to using cocaine and marijuana in the presence of the children. The children's father, Keith E. (Father), was not living with the children at the time; he was residing in Dayton, Ohio. The children were placed in the temporary custody of their paternal grandmother.

The dependency and neglect hearing occurred on February 6, 2006 and both Mother and Father were present at the hearing. Following the hearing, the court declared the children dependent and neglected and adopted a safety plan that specified several requirements for Mother but none for Father. The same safety plan was adopted on July 13, 2006 and January 25, 2007, and as before, none of the safety plans listed any requirements or recommendations for Father. Shortly thereafter, the placement of the children was changed; they were placed in the custody of the maternal grandmother in Tullahoma, Tennessee.

On May 9, 2007, the Department filed a petition to modify the safety plan. The Department alleged that Mother was endangering the children because she and her domestic partner, who had a history of domestic violence and sexual abuse,[2] were living with the children at the home of the maternal grandmother. At the time, Father was residing in Murfreesboro, Tennessee. The Department also petitioned the court to place the children into the custody of the Department, which the trial court granted on May 10, 2007.[3]

On May 29, 2007, permanent parenting plans were created for the three children. Father was not present at the meeting to create the permanency plans. The plans listed many requirements of Mother, while Father's responsibilities were minimal. Father was required to stay in contact with his Department caseworker, maintain regular, supervised visitation

---

[2]Mother had previously obtained an order of protection against this man due to domestic assault on Mother.

[3]In its Petition for Temporary Custody, the Department noted that both Mother and Father were under court ordered safety plans. Notably, none of these safety plans addressed Father in any way nor did they place any requirements upon Father.

with the children, and contact the Department to arrange each visitation. Specifically, the plan stated that "due to the lack of relationship" Father would "need to contact DCS and at that time visitation will be determined." Subsequently, the permanency plan provided that the goal was to reunify the children with Father with the desired outcome that "[Father] will have a more positive relationship with [child]." The actions listed as needed in order to achieve this desired outcome were:

1a) In the event that [Father] desires visitation, he will need to contact DCS and at that time visitation will be determined.
1b) [Father] will be given opportunity to participate in the permanency plan.

As Father was not at the meeting, he did not sign or ratify the permanency plans. The plans were ratified by the court four months later.

On June 1, 2007, after the creation of the permanency plans, Ms. Brandi Shelton was assigned as the Department caseworker. Ms. Shelton's first contact with Father was at a court hearing in July 2007, at which time she "briefly" discussed the requirements of the permanency plan with Father regarding his contact with the Department and visitation with the children. At this hearing, the trial court ordered a home study of Father's home to be completed within thirty days; however, the home study never occurred. Ms. Shelton stated that Father was "uncooperative" in setting up the home visit, and, thus it was never completed.

Father's first visit with his children after the July 2007 hearing was on August 8, 2007. Father's next visit with the children was a year later, in August 2008. Father did not see the children again until February 2009. Father told Ms. Shelton that transportation issues prevented him from visiting his children more frequently, as the visits were in Tullahoma and Father lived in Murfreesboro. Father also stated that he did not visit the children more frequently because he did not want to interfere with attempts by Mother to reunite with the children and he believed that when Mother obtained custody of the children that he and she would arrange visitation.

On July 11, 2008, the Department filed the petition to terminate the parental rights of both parents. The parental rights of both parents were terminated by order entered on October 1, 2009. Mother did not appeal the termination of her parental rights. Accordingly, we will focus our attention on the facts and procedural history that are relevant to Father.

The initial petition filed by the Department alleged two grounds for termination, that Father abandoned the children by failing to visit and that he was in substantial noncompliance with the permanency plan. Eight months after the petition was filed, the

Department sent Father letters explaining the requirements of visitation and the consequences of not maintaining regular visitation. Four letters were sent to Father, the first in February 2009 and the last in April 2009. Father visited with the children on February 19, 2009, April 2, 2009, April 15, 2009, and May 20, 2009. Two other scheduled visits were cancelled because Father did not call to confirm the visitation; one of the days Father called the day of the visit to confirm, but the visit had already been cancelled by the caseworker.

The trial on the petition to terminate Father's parental rights began on May 21, 2009. The Department presented the testimony of Father's Department caseworker, Brandi Shelton, the testimony of Cheryl Neal, a licensed social worker who had worked with Father at The Guidance Center in Murfreesboro, and the testimony of the director of CASA, Lynne Farrar, who observed two visits between Father and the children.

Ms. Shelton testified that she had trouble staying in contact with Father because he did not have his telephone and she had to call his mother in order to contact him. She also stated that Father was "evasive" when answering questions and that she often had to ask Father questions repeatedly in order to get an answer. Though she stated contact with Father was sporadic and difficult, she maintained that she instructed Father on "numerous" occasions about his requirements under the permanency plan. Ms. Shelton also testified that at some point she realized it was best to put Father's requirements regarding visitation into writing and began sending him letters; she thought Father might need help remembering.

Ms. Farrar, the director of CASA, testified that she witnessed a one-hour visitation in April 2009 between Father and the children at a McDonald's. She stated that the visit "seemed to be going ok" until Father whispered something to one of the children and Ms. Shelton instructed him not to do that, after which Father became upset. She was also present at another visit that took place at Father's apartment and then at a McDonald's. During this visit, Father became upset when Ms. Shelton criticized the way he was playing with the children; Ms. Farrar stated that one child became upset when Father shouted "my son" or "my boy" loudly. She also testified that the children were affectionate with Father at times, but she attributed this to the children's affectionate nature.

Cheryl Neal, a licensed social worker who worked with Father at The Guidance Center, testified that Father had been diagnosed by a psychiatrist at the facility with schizoaffective disorder, which is a combination of schizophrenia and mood disorder. She explained that Father was not referred by the Department of Children's Services; instead, he was referred in the spring of 2008 by hospital staff following his hospitalizations due to two episodes of hallucinations. One such episode occurred on February 22, 2008, when Father was found in the floor of a laundromat rocking back and forth and repeating his name and birth date. In another episode, Father believed that insects were crawling all over him.

Following her first contact with Father in the spring of 2008, Ms. Neal met with Father five times. Her last visit occurred one week prior to the first day of trial, in May 2009. Ms. Neal testified that the frequency of their meetings was not unusual, although Father sometimes missed scheduled appointments. Based on his condition at their last visit, Ms. Neal stated that she did not believe Father would be able to properly care for his children, that Father's compliance with his medication was questionable, but such problems were "consistent" with his diagnosis of schizoaffective disorder. She stated that typical symptoms of his mental illness were poor judgment and not showing up for appointments. Ms. Neal also stated that Father would likely be more stable with a good support system and the resumption of case management services.[4] Ms. Neal stated that Father had benefitted from their services and, when asked what might assist Father further with his mental illness, Ms. Neal stated that a psychosocial day program often benefitted persons with schizoaffective disorder. Father was also examined by a psychiatrist and assigned a case manager at The Guidance Center; however, it was Ms. Neal's role to follow-up with Father regarding therapy the hospital psychiatrist had recommended.

The testimony presented at trial concerning Father's mental illness caused the court to question whether Father's failure to visit the children and his noncompliance with the permanency plan were willful. Ms. Shelton, the caseworker, stated that she became aware that Father was receiving psychological counseling in August of 2008 and, in February 2009, she became aware that Father had seen a psychiatrist. Ms. Shelton also testified that she requested that Father sign a release so she could obtain his medical records. Father informed her in April 2009 that he had done so; however, it was not until one week before trial, May 2009, that Ms. Shelton spoke with someone at The Guidance Center about Father's mental health.[5]

At the close of the proof on the first day of trial, the Department moved to amend their petition to add mental incompetence as a ground for termination of Father's parental rights. The trial court granted the amendment and then the trial court, acting *sua sponte* in light of Father's schizoaffective disorder, requested the parties brief the issue of whether Father's failure to visit his children and comply with the permanency plan was willful. By agreement of the parties, Thomas C. Monroe, III, Psy.D., a licensed clinical psychologist conducted a

---

[4]Ms. Neal testified that Father ceased receiving case management services in January 2009, due to an "oversight." Father was briefly incarcerated for driving on a suspended license, at which time services were suspended. Ms. Neal stated that it was probably an "oversight" on their part that their services had not resumed.

[5]Ms. Shelton stated that she left a prior message with The Guidance Center that was not returned. The record indicates the mental health facility suffered significant damage in a tornado the previous week and was not open for business.

psychological assessment of Father on August 8, 2009. He first conducted a clinical interview, then a Personality Assessment Inventory (PAI), a Wechsler Adult Intelligence Scale – 3rd Edition subscale (WAIS) examination, and a Rorschach evaluation. Dr. Monroe prepared a written Psychological Assessment, dated August 16, after which the evidentiary deposition of Dr. Monroe was taken. His deposition was introduced into evidence on the second day of trial, September 10, 2009.

Dr. Monroe testified in pertinent part that Father meets the diagnostic criteria for schizoaffective disorder. He stated that Father was actively delusional when they met and Father reported a history of auditory hallucinations, depressive episodes, and some manic symptoms, if not complete manic episodes. Dr. Monroe explained that "[s]chizoaffective [d]isorder is like a combination of schizophrenia, where there are hallucinations and delusions, and an affective disorder, such as depression or bi-polar disorder." He further explained that: "Strict straight-forward schizophrenia does not generally have a mood component, where there are mood congruent hallucinations or mood congruent delusions. Straight schizophrenia is just a thought disorder." When asked whether Father can become capable of caring for his children, Dr. Monroe stated: "Possibly. If he seeks treatment and if they find good treatments for what – for his illness, and he takes the medication, he possibly could become a competent parent." He then stated that Father could have up to a 50 percent success rate with proper treatment, and that it should be known within six months if there is any chance for him to be able to properly care for his children.

Dr. Monroe additionally made the following recommendations:

1. [Father] meets the diagnostic criteria for Schizoaffective Disorder, type not specified. *He should seek medical treatment from a mental health center immediately as a requirement for any possible attempt at familial reconciliation*. He should comply with his doctor's orders for a period of no less than 6 months prior to any further consideration as a placement option for his children. At that time, the court and/or DCS may require further testing or evaluation to determine if the treatment has brought about sufficient improvement to warrant further consideration as a placement for his children. (emphasis added).

2. If [Father] is unwilling to accept and follow medical treatment, he should not be considered as a placement for his children. His current functioning will not allow him to serve in that capacity.

The deposition of Dr. Monroe was the only evidence presented on the second day of the trial. After counsel were afforded the opportunity to make closing statements, the court

took the case under advisement. On October 1, 2009, the trial court issued an order finding the Department had proven the grounds of abandonment by failure to visit, substantial noncompliance with the requirements of the permanency plan, and mental incompetence. The court also found that termination was in the best interests of the children and therefore it terminated Father's parental rights to all three children. Father filed a timely appeal.[6]

## ANALYSIS

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proven by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). The issue of substantial noncompliance with the requirements of a permanency plan is a

_____

[6]The court also terminated Mother's parental rights but she did not appeal.

question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546 (citing *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn. 2002)).

ISSUES

Father raises three issues. One, he contends the evidence does not establish that his mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that he will be able to care for his children in the near future. Two, he contends his substantial noncompliance with the requirements of the permanency plan was not willful. Three, he contends his failure to visit his children was not willful. We will discuss each in turn.

THE DEPARTMENT'S RESPONSIBILITIES

The Department is the agency with the responsibility for the care and protection of dependent and neglected children; it plays the pivotal role in such matters. Because of the Department's role in the lives of dependent and neglected children and their families, the General Assembly has imposed on the Department "*the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home.*" *In re Tiffany B*., 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166) (emphasis added).

The General Assembly recognized, as a matter of public policy, that families are among the fundamental building blocks of society, Tenn. Code Ann. § 36-3-113(a); thus, the statutes empowering the courts to remove children from the custody of their parents state that one of the Department's primary purposes is to protect children from "unnecessary separation" from their parents. *In re Tiffany B*., 228 S.W.3d at 157 (citing Tenn. Code Ann. § 37-2-401(a)). In this regard,

> The Department must memorialize its efforts in an individualized permanency plan prepared for every dependent and neglected child placed in its custody. The requirements in each permanency plan must be directed toward remedying the conditions that led to the child's removal from his or her parent's custody. *In re Valentine*, 79 S.W.3d at 547; *In re M.J.B*., 140 S.W.3d at 656-57; *In re L.J.C*., 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003). Reflecting the Tennessee General Assembly's understanding that the ability of parents to rehabilitate themselves depends on the Department's assistance and support, permanency plans place obligations on the Department to help parents become better able to provide their children with a safe and stable home and with consistent and

appropriate care. *In re C.S., Jr.,* No. M2005-02499- COA-R3-PT, 2006 WL 2644371, at *9 (Tenn. Ct. App. Sept. 14, 2006).

*Id.* at 158 (footnote omitted).

MENTAL INCOMPETENCE

Tennessee Code Annotated § 36-1-113(g)(8) provides that the court may terminate the parental rights of a parent if it determines on the basis of clear and convincing evidence that:

> (B) (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is *presently so impaired and is so likely to remain so* that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future, and . . . ;
>
> (C)  In the circumstances described under subdivisions (8)(A) and (8)(B), no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8)(B)-(C) (emphasis added).

As the statute expressly provides, the Department has the burden to demonstrate by clear and convincing evidence both that Father is *presently* unable to care for the children <u>and</u> that it is *unlikely* that Father will be able to assume the care of and responsibility for the children *in the near future*. Tenn. Code Ann. § 36-1-113(g)(8). We find that the Department established that Father is presently unable to care for the children due to his mental condition; however, the Department failed to demonstrate by clear and convincing evidence that it is unlikely that Father would be unable to care for the children in the near future.[7] To the contrary, the expert testimony presented at trial, principally that of Dr. Monroe, established,

---

[7]The clear and convincing evidence standard is a heightened burden of proof which serves to minimize the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. *In re C.W.W.*, 37 S.W.3d at 474. Clear and convincing evidence should produce a firm belief or conviction with regard to the truth of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

-9-

without contradiction, that Father, with proper treatment and medication over a period of six months, may be appropriate for consideration as a placement option for his children. Dr. Monroe further stated that persons with Father's diagnosis have up to a 50 percent success rate with proper treatment and medication.

It is also very pertinent that Dr. Monroe recommended that Father immediately receive medical treatment from a mental health center as a requirement for any possible attempt at familial reconciliation; yet the Department provided no services to assist Father with his mental health needs. To the contrary, its only effort was to move to amend the petition to terminate Father's parental rights on the ground that Father was mentally incompetent to care for his children.

The evidence in the record reveals that the Department should have included a mental health evaluation or assessment as part of Father's permanency plan. Further, if the evaluation recommended mental health services or treatment, the Department had an affirmative duty to exert reasonable efforts to provide the mental health services, if such services were reasonable to further the plan of reunification of Father with his children. *See* Tenn. Code Ann. § 37-1-166(g)(1). The testimony by the caseworker and the affidavit regarding the Department's efforts reveal that essentially no services were offered to assist Father. More importantly, no mental health services were offered to assist Father to accomplish the stated goal of reunification with his children.

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) *the parents'* physical and *mental abilities*, (3) *the resources available to the parents*, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) *the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts*. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)) (footnote omitted). While the Department does not have to exert herculean efforts, they must do more than "rely on parents to facilitate their own rehabilitation." *In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *5 (Tenn. Ct. Ap. Dec. 13, 2007) (citing *In re M.B.*, No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn. Ct. App. Mar. 30, 2007)).

This court has repeatedly addressed the importance of Department employees using "their superior insight and training to assist parents" in remedying the problems that lead to

removal of the children, including mental health problems, and the importance of the Department exerting reasonable efforts to assist a parent whose mental condition presents an obstacle to reunification. *See In re M.A.P.*, 2009 WL 2003357, at *16 (Tenn. Ct. App. July 10, 2009) (quoting *In re C.M.M.*, 2004 WL 438326, at *7 (Tenn. Ct. App. March 9, 2004)). While a few cases hold the Department is not usually required to exert efforts to assist a parent when the ground of mental incompetence is proven,[8] this is not part of the statutory scheme. The Department is relieved of this obligation when the court finds an aggravated circumstance exists. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A)-(C)[9]; *In re B.L.C.*, 2007 WL 4322068, at *9 (Tenn. Ct. App. Dec. 6, 2007).

There are cases in which a parent is proven to be so mentally incapacitated that efforts by the Department to address the parent's mental health issues would be in vain. In those cases, where (1) the parent's mental condition is presently so impaired <u>and</u> (2) the parent's

[8]Two of these cases are *In re C.M.M.*, 2004 WL 438326, and *Dep't of Children's Services v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038 (Tenn. Ct. App. Jan. 17, 2007). In footnote 26 of the *C.M.M.* opinion, the court states: "Termination proceedings based on the grounds in Tenn. Code Ann. § 36-1-113(g)(4)-(8) *usually* will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents." *In re C.M.M.*, 2004 WL 438326 at *7 (emphasis added). Three years later, in *M.R.N.*, this court makes two references to *C.M.M.* on page twelve of the opinion. In the first reference, *M.R.N.* correctly quotes *C.M.M.* stating: "Termination proceedings based on the grounds in Tenn.Code Ann. § 36-1-113(g)(4)-(8) usually will not require the Department to demonstrate that it has made reasonable efforts to reunite a child with his or her parents." *M.R.N.*, 2007 WL 120038 at * 12 (quoting *In re C.M.M.*, 2004 Tenn. App. LEXIS 160, at *28, n. 26, 2004 WL 438326). In the second reference to *C.M.M.* on page 12, *M.R.N.* states: "As we have stated, DCS is not required to establish reasonable efforts in cases involving the statutory ground of mental incompetence of the parent." *M.R.N.*, 2007 WL 120038 at * 12. The term "usually" does not appear in this sentence. We believe the omission of that qualifying term is significant; accordingly, we believe the court's statement that reasonable efforts are not required in cases involving the ground of mental incompetence is a misconstruction of *C.M.M.* and Tenn. Code Ann. § 36-1-113(g)(8)(B). The statutory ground of mental incompetency has two essential components, both of which the Department mus prove by clear and convincing evidence. As Tennessee Code Annotated § 36-1-113(g)(8)(B) expressly provides, the Department is required to prove the parent "is incompetent to adequately provide for the further care and supervision of the child *because* the parent's . . . mental condition is *presently so impaired <u>and</u> is* so *likely to remain so* that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future, . . ."

[9] Tenn. Code Ann. § 37-1-166(g)(4) provides that reasonable efforts shall not be required if the court has determined that the parent has subjected the child or any sibling or half-sibling of the child, or any other child residing in the home to "aggravated circumstances" as defined in Tenn. Code Ann. § 36-1-102. Subsection (B) references Tenn. Code Ann. § 36-1-113, which lists the aggravating circumstances to be when the parent has committed murder, voluntary manslaughter, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that results in serious bodily injury to the child or any sibling or half-sibling of the child who is the subject of the petition or any other child residing temporarily or permanently in the home.

mental condition is so likely to remain so that it is unlikely that the parent will be able to resume responsibility for the child in the near future, the Department is excused from exerting efforts to reunify the parent and child. That has not been proven to be the case here, at least not yet.

Mental illness compromises a parent's ability to address his or her own problems and "a parent with serious mental illness cannot reasonably be expected to simply lift herself up by the bootstraps with no assistance. *In re M.A.P.*, 2009 WL 2003357, *18 (citing *In re A.R.*, 2007 WL 4357837, at *6-10). Therefore, the fact that a parent in need of mental health services does not request the assistance of the Department to deal with his or her mental health needs does not relieve the Department of its responsibility to exert reasonable efforts to assist the parent. To the contrary, we have emphasized the fact that the Department's employees are to "use their superior insight and training to assist parents" in remedying the problems that lead to removal of the children, including mental health problems. *Id*.

In the matter of *M.A.P.*, we determined the Department failed to exert reasonable efforts to assist the mother "with respect to her underlying mental illness." even though she did not request such services. *Id*. at *1; *accord In re A.R.*, 2007 WL 4357837 (reversing the termination of parental rights where the Department was aware that the parents needed significant psychological services and failed to provide such services). As is the case here, the mother in *M.A.P.* was diagnosed with schizoaffective disorder. *Id*. The court referred to this condition as the "root problem" yet the Department failed to provide any services to address the root problem. *Id*. at *16. The court in that case went on to hold that the assistance provided to the mentally ill parent was "simply inadequate; there was a complete failure to provide any assistance at all to Mother with her fundamental challenge, her mental illness." *Id*. at *18.

The Department did not have actual notice that Father was diagnosed with schizoaffective disorder until the week prior to trial; however, the Department's caseworkers should have ascertained, at an earlier date, by using their superior insight and training that Father had a mental condition that compromised his ability to comply with the Permanency Plan. Nevertheless, there were more than adequate signs, prior to the filing of the petition, which indicated that Father was substantially impaired by a mental condition or mental illness. Moreover, the Department's caseworker was aware long before trial that Father was receiving some form of mental health counseling yet she made no inquiries concerning his mental health or services that he needed. We also note that the Department was advised that Father was diagnosed with schizoaffective disorder in April of 2009, a month prior to the final hearing, yet the only affirmative step the Department took at that time was to amend the petition to additionally assert that he was mentally incompetent or mentally incapacitated to properly care for the children.

COMPLIANCE WITH THE PERMANENCY PLAN

As we discussed previously, the Department of Children's Services is the state agency with primary responsibility for the care and protection of dependent and neglected children. It plays a direct role in the removal of most dependent and neglected children from their parents' custody, and Tennessee's juvenile courts regularly place these children in the Department's custody. Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home. Tenn. Code Ann. § 37-1-166.

The primary purpose of permanency plans and, thus the requirements in each permanency plan must be directed toward remedying the conditions that led to the child's removal from his or her parents. *In re Valentine*, 79 S.W.3d at 547; *In re M.J.B.*, 140 S.W.3d at 656-57; *In re L.J.C.*, 124 S.W.3d at 621. In furtherance of an appropriate plan, the Department must exert reasonable efforts to reunify parents and their children by, *inter alia*, exercising "reasonable care and diligence . . . *to provide services related to meeting the needs of the child and the family*." *In re Tiffany B.*, 228 S.W.3d at 157 (citing Tenn. Code Ann. § 37-1-166(g)(1)) (emphasis added). Accordingly, a key component of any permanency plan is "the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Departments efforts." *Id.* at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519) (footnote omitted). The Tennessee General Assembly has recognized that one of the most effective ways to improve the lives of dependent and neglected children is to improve the ability of their parents to be nurturing caregivers. *Id.* at 157. Improving parenting skills results in better parents and, in turn, happier and more well-adjusted children. *Id.*

In this case, the permanency plans crafted by the Department stated that the goal for Father was reunification, yet the only requirements of Father were that he contact the Department to schedule visitation, maintain regular visitation, and stay in contact with his Department caseworker. Notably, there were no requirements that Father take parenting classes, obtain suitable housing, or maintain steady employment; there were also no requirements that Father obtain a mental health evaluation or treatment.

The children were removed when they were residing with Mother, not Father; nevertheless, Father's parenting skills were suspect when the children were removed from their mother's care. Father's parenting skills, or lack thereof, should have become even more suspect as time passed, yet at no time did the Department require that Father take parenting classes, obtain suitable housing, maintain steady employment, or have a mental health

evaluation. The absence of any of these requirements is counterintuitive to the goal of reunification.

The record clearly reveals the Department never believed Father was fit to care for the children; accordingly, the Department should have crafted a plan to assist Father in achieving the plan goal of reunification. It seems most disingenuous that the stated goal was reunification, yet the only requirement was visitation. If the Department had no expectations of Father being able to care for the children, the stated goal could have been termination of Father's rights from the inception.

Not only were the requirements of the plan deficient, the Department's efforts were as well. Tennessee Code Annotated § 37-1-166(c) requires that the Department file an affidavit demonstrating the reasonable efforts taken by the Department. Ironically, the affidavit of the Department's "reasonable efforts" to assist Father is titled "Affidavit of Case Manger [sic] Brandie Shelton Concerning Criteria for Termination of Parental Rights."[10] In it, Ms. Shelton states:

> 2. Prior to the filing of the termination of parental rights in this matter on July 11, 2008 two separate sets of plans had been drafted. The initial plans were drafted on May 29, 2007. . . .[11]
>
> 3. The child's father. . .was given notice of that meeting by notice sent to his most recent address, based upon the records in the file. [Father] did not attend this meeting.
>
> 3.(sic) I took over this case on Friday June, 1 2007 as case manager. On Monday June 4, 2007, I presented the plans to the legal department's administrative assistant to be presented to the court for approval. I have been

[10]Tenn. Code Ann. § 37-1-166(c) requires that the Department file an affidavit demonstrating the "reasonable efforts" taken by the Department, not efforts "for termination." The trial transcript indicates that the affidavit was not filed at the same time as the petition to terminate parental rights as the Department's attorney indicated to the court that an affidavit would be filed in order to comply with the statutory requirements. This is the only affidavit in the record.

[11]The rest of the sentence appears incomplete as no further dates are given for later permanency plans. Additionally, it does not appear that a second set of permanency plans was ratified by the trial court in regards to Father. In its brief, the Department references an order of the court from a permanency hearing which states that the Department intended to add adoption as a dual goal along with reunification. However, the second set of permanency plans appears nowhere in the record and statements in the trial transcript indicate that the second set of permanency plans was not ratified.

a case manger [sic] for 31/2 years with the Department and have maintained a case load of approximately 15 children since that time. Each year I am involved in preparation of approximately 30 permanency plans. My job requirements and my standard method of operations, which I was utilizing on June 1, 2007, is for the case manager to mail a copy of each set of plans to each child's parents by U.S. mail to the parent's most recent address if the parent does not attend the meeting. This is an invariable habit.[12]

4. I would have mailed a copy by U.S. mail postage prepaid to his address at . . . Each plan had attached to it the Criteria and Procedures for Termination of Parental Rights. A copy of the Criteria is attached to this affidavit. This document outlines the legal consequences for the parents' actions for, among other acts, the parents' failure to visit and support their children, known as abandonment. This was provided to [Father] each time the new plans were prepared.

5. Plans were subsequently prepared for these children on April 30, 2008 and a meeting was held at that time to which [Father] was invited to participate. He was notified by phone, because he had not responded to a letter I sent to him on April 4, 2008 in order to re-establish contact with him and update contact information for him. He did not attend the meeting. These plans were sent by U.S. mail postage prepaid to [Father] at his address at . . . Murfreesboro, TN. . . These plans also contained the above described "Criteria". These plans were not returned to the Department.

6. I spoke to [Father] prior to that April 2008 meeting and discussed with him that the new plans were going to contain an additional goal of adoption, based upon his failure to visit the children. I advised him at that time verbally that failure to visit is a ground for termination of parental rights. [Father] was upset by this change. However, he did not appear at the meeting and did not request visitation with the children until August 15, 2008.

The testimony of the caseworker at trial provides few additional facts to supplement the sparse efforts stated in the affidavit. Significantly, no reunification services are mentioned, e.g. parenting classes, anger management classes, or mental health treatment, only the minimal administrative duties such as mailing of the plan along with written

_____

[12]Notably, in Ms. Shelton's testimony at trial, she did not state that she mailed Father a copy but stated that "he would have been mailed a copy after the meeting." We are troubled that nowhere is it conclusively shown that Father was mailed a copy of the initial permanency plan.

-15-

admonitions regarding the requirement that Father visit his children are listed in the permanency plan.

The Department has the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet the Father's needs in assisting him in fulfilling his obligations under the permanency plans. *In re R.L.F.*, 278 S.W.3d 305, 315-316 (Tenn. Ct. App. 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *In re C.M.M.*, 2004 WL 438326 at *8; Tenn. Code Ann. § 36-1-113(c)). Under this burden, the Department must present sufficient evidence to enable this court to conclude, without serious or substantial doubt, that the Department's efforts were reasonable under the circumstances. *Id*. at 316 (citing *In re Valentine*, 79 S.W.3d at 546; *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. ); *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997)).

As was the case in *Tiffany B.*, the record, considered in its entirety, leaves the distinct impression that the Department neither prepared an appropriate permanency plan nor did it expend much effort to assist Father after it obtained custody of his children. Despite its knowledge, actual or constructive, that Father's ability to function was compromised due to some sort of mental condition, the Department obviously expected Father to initiate the appropriate remedial efforts on his own and to contact the case manager when he chose to do so. This expectation was clearly unreasonable. As this court stated in *Tiffany B.*:

> In circumstances that do not involve serious physical abuse or harm to the child, the law does not permit the Department to be passive when it removes children from their parents' custody. The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family. The Department has not presented clear and convincing evidence that it did so in this case. Therefore, we have no choice other than to vacate the order terminating the parents parental rights and remand the case for further proceedings.

*In re Tiffany B.*, 228 S.W.3d at 160 (footnote omitted). The evidence in the record reveals that the permanency plan was not crafted to address requirements needed to accomplish the stated goal of reunification and the Department exerted no effort to assist Father to accomplish that goal. Accordingly, the permanency plan, as well as the Department's so-called efforts, fail the test.

We therefore reverse the trial court's finding that Father was in substantial noncompliance with the permanency plan.

The trial court also found that Father abandoned the children by willfully failing to visit. A parent abandons a child if for a period of four consecutive months immediately preceding the filing of a petition to terminate the parental rights of the parent, it is established that the parent willfully failed to visit, willfully failed to support, or willfully failed to make reasonable payments toward the support of the child. Tenn. Code Ann. § 36-1-102(1)(A)(i).

The petition to terminate Father's parental rights was filed on July 11, 2008. Father's last visitation prior to the filing of the termination petition occurred in August 2007. At the time of the filing, Father had not visited the children for over ten months. Thus, this portion of the statutory requirement was demonstrated by clear and convincing evidence. Father's argument regarding this ground is that due to his diagnosis of schizoaffective disorder, the "willfulness" requirement of the statute was not met. This court discussed the definition and requirements of willfulness at great length in *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005):

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark. App. 71, 32 S.W.3d 758, 760 (Ark. Ct. App. 2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa. Super. 355, 574 A.2d 649, 652 (Pa. Super. Ct. 1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982).

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. *In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Absar v. Jones*, 833 S.W.2d 86, 89-90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000).

*In re Audrey S.*, 182 S.W.3d at 864.

As the court noted, "failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do

so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re M.J.B.*, 140 S.W.3d at 654) (other citations omitted). The willfulness standard requires that a parent both have the capacity to fulfill the visitation requirement and "no justifiable excuse for not doing so." *Id*.

In this case, the Department has the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet the Father's needs in assisting him in fulfilling his obligations under the permanency plans. *In re R.L.F.*, 278 S.W.3d at 315-316. Other than contacting the Department, the only requirement of Father under the plan was to "visit" his children. The only service the Department provided was supervision of the visits. It did not provide assistance to Father in any other capacity.

The statutory scheme excludes the requirement of reasonable efforts under certain circumstances *only if the court has determined* that "aggravated circumstances" exist. *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *9 (Tenn. Ct. App. Dec. 6, 2007). The circumstances under which the Department is excused from exerting reasonable efforts to aid reunification of the family was discussed at length in the case of *In re B.L.C.*:

> Tennessee Code Annotated § 36-1-102(9) defines "aggravated circumstances" to mean "*abandonment*, abandonment of an infant, aggravated assault, aggravated kidnapping, especially aggravated kidnapping, aggravated child abuse and neglect, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated rape, rape, rape of a child, incest, or severe child abuse, as defined at § 37-1-102." (emphasis added). As is seen from the italicized portion of *the statute cited above*, its plain language *relieves DCS of its responsibility to make reasonable efforts only if a court of competent jurisdiction has made a determination that aggravated circumstances exist, along with the other statutory requirements. The statute does not allow DCS to take the approach of doing nothing on a parent's case, providing no assistance, in the hopes that a court will later make a finding of abandonment that retroactively "forgives" DCS's lack of efforts, particularly when, as is the case here, DCS's failure to make a reasonable effort arguably was a significant factor in enabling DCS to argue that [the parent] abandoned her children.*

> We believe the most reasonable and natural interpretation of the statute at issue is that *DCS is relieved of its responsibility to make reasonable efforts to assist in the preservation and reunification of families that the State has decided to separate at such time that a court of competent jurisdiction makes the required*

-18-

*determination of aggravated circumstances, and <u>not before</u>*. Prior to such a determination, DCS must continue to make reasonable efforts. To hold otherwise would be to create an unacceptable level of uncertainty among DCS's staff members as to whether, and when, they are required to exercise reasonable efforts, because the answer to that question would not be clear until a trial court, or possibly an appellate court, rules on the issue of abandonment. A "wrong guess" on DCS's part would create an unacceptably long delay in an area of the law, termination of parental rights, where expediency is of particular importance. We also make this determination mindful of a parent's fundamental constitutional rights in this regard, and the profound, permanent consequences of an order terminating a person's parental rights.

*Id*. at *9 (emphasis added).

Here, the trial court did not make the determination that Father had "abandoned" the children by failing to visit them until October 1, 2009, after the trial concluded. Accordingly, the Department was not relieved of the duty to exert reasonable efforts to assist Father to reunite with the children. For all practical purposes, the only effort exerted by the Department was to supervise visitation, if and when Father called the Department.

The Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet the Father's needs in assisting him in fulfilling his obligations under the permanency plans. *In re R.L.F.*, 278 S.W.3d at 315-316. Moreover, the Department had the burden to present sufficient evidence to enable this court to conclude, without serious or substantial doubt, that the Department's efforts were reasonable under the circumstances. *Id*. We have determined the Department failed to present evidence sufficient to enable this court to conclude, *without serious or substantial doubt*, that the Department's efforts were reasonable under the circumstances of this case.

Accordingly, we reverse the trial court's finding that Father abandoned the children by willfully failing to visit.

### Best Interests of the Children

As we have reversed the trial court's determinations on all three grounds for termination, there is no ground upon which Father's parental rights may be terminated. Accordingly, the issue of best interests is mooted. *See In re D.L.B.*, 118 S.W.3d at 367.

## IN CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded with costs of appeal assessed against the Department of Children's Services.

_____
FRANK G. CLEMENT, JR., JUDGE